UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SHIMSHON WEXLER, *on behalf of himself and all others similarly situated,*

Plaintiff,

-v-

LVNV FUNDING, LLC *and* RESURGENT CAPITAL SERVICES LP,

Defendants.

---

22 Civ. 1348 (PAE)

<u>OPINION & ORDER</u>

---

PAUL A. ENGELMAYER, District Judge:

This decision resolves a motion to compel arbitration of plaintiff Shimshon Wexler's claims under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.*, against defendants LVNV Funding, LLC ("LVNV") and Resurgent Capital Services, LP ("Resurgent") (together, "defendants"). Wexler's claims are that LVNV falsely claimed to have purchased debt he incurred on a personal credit card and that it and its portfolio manager Resurgent are attempting illegally to collect on that debt.

For the foregoing reasons, the Court grants the motion to compel arbitration.

## I.    Background[1]

### A.    Factual Background

#### 1.    Wexler's Alleged Debt and the Attempts to Collect It

---

[1] Courts in this Circuit generally evaluate motions to compel arbitration under standards similar to those for motions for summary judgment. *See Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 49 (2d Cir. 2022). In so doing, courts consider all relevant, admissible evidence supplied by the parties, and draw reasonable inferences in favor of the non-moving party. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017). Accordingly, the Court draws the following facts from the parties' submissions on defendants' motion to compel arbitration.

LVNV is a post-default purchaser of consumer debts. Dkt. 1 ("Compl.") ¶¶ 10–21. LVNV buys defaulted debts at discounted rates, and then seeks to collect the full amount owed. *Id.* ¶ 10. Resurgent collects debts owed to third parties. *Id.* ¶¶ 24, 36. Resurgent manages and collects LVNV's debts. *Id.* ¶ 25.

At some time before November 1, 2019, Wexler incurred a debt to Citibank on a personal credit card account in his name ending in 4826.[2] *Id.* ¶¶ 27–28. The "[d]ebt arose out of transactions" that were "primarily for personal, family or household purposes, namely fees alleged to have emanat[ed] from a personal credit card account in [Wexler's] name that was issued by Citibank." *Id.* ¶ 28.

At some later point, Wexler alleges, LVNV claims it purchased the debt in connection with this credit card account after default. *Id.* ¶ 32. This purchase occurred through a series of transactions. First, Citibank transferred its interests in Wexler's account to Sherman Originator III LLC. Dkt. 33 ("Master Purchase Agreement"); Dkt. 27-1 at 1. Second, Sherman Originator III LLC transferred that interest to Sherman Originator LLC. Dkt. 27-1 at 2. Third, and finally, Sherman Originator LLC transferred the interest to LVNV. *Id.* Through Resurgent, LVNV attempted to collect on Wexler's debt. Compl. ¶ 37.

On February 15, 2021, Wexler visited Resurgent's website, which stated that he owed a balance of $4,409.88 on the debt. *Id.* ¶¶ 38–39. The website presented the option to make a one-time payment of $1,322.96 to settle the entire debt, for a savings of $3,086.92. *Id.* ¶¶ 40–41. Wexler paid the $1,322.96. *Id.* ¶ 42. Resurgent acknowledged this payment in a letter dated February 20, 2021. *Id.* ¶ 43. Despite making the payment, Wexler disputes that he owed the

---

[2] Wexler appears to dispute that there was an underlying debt to Citibank, referring to it as the "alleged debt" throughout the Complaint. *See, e.g.*, Compl. ¶ 25.

debt to LVNV, or that LVNV had purchased the debt from Citibank or any other entity. *Id.*
¶¶ 32, 42; *see also* Dkt. 43 at 1.

Wexler alleges that, after his payment, defendants continued to attempt to collect on the
debt.  Compl. ¶ 44.  On February 18, 2021, defendants sent Wexler two letters indicating that he
owed a balance of $3,086.92, rather than crediting the one-time payment as settling the entire
debt.  *Id.* ¶¶ 45–47; *id.* Exs. A–B.  Around March 3, 2021, defendants updated Wexler's credit
report to indicate his balance on the debt as being $3,086.92, notwithstanding Wexler's
understanding that the one-payment had settled the debt.  *Id.* ¶¶ 68–70.  On March 16, 2021,
Resurgent emailed Wexler notifying him that he missed his last payment.  *Id.* ¶¶ 56–60.

### 2.    The Arbitration Agreement and Assignments

In support of the motion to compel arbitration, defendants have produced documents
reflecting the parties' alleged arbitration agreement and the assignment of Citibank's rights as
against Wexler.

The credit card agreement between Wexler and Citibank, *see* Dkt. 38-5 ("credit card
agreement"), provides, in pertinent part:

> **You or we may arbitrate** any claim, dispute or controversy between you and us
> arising out of or related to your Account, a previous related Account or our
> relationship (called "Claims"). . . . Except as stated below, all Claims are subject
> to arbitration, no matter what legal theory they're based on or what remedy
> (damages, or injunctive or declaratory relief) they seek, including Claims based on
> contract, tort (including intentional tort), fraud, agency, your or our negligence,
> statutory or regulatory provisions, or any other sources of law; Claims made as
> counterclaims, cross-claims, third-party claims, interpleaders or otherwise; Claims
> made regarding past, present, or future conduct; and Claims made independently or
> with other claims.  This also includes Claims made by or against anyone connected
> with us or you or claiming through us or you, or by someone making a claim
> through us or you, such as a co-applicant, authorized user, employee, agent,
> representative or an affiliated/parent/subsidiary company.

*Id.* at 11 (emphasis in original).[3]   The agreement further provides that "[a]rbitration shall be conducted by the American Arbitration Association ('AAA') according to . . . the applicable AAA arbitration rules in effect," and invokes the AAA's rules and forms in describing the arbitral procedures.  *Id.* at 12.   The agreement states that the arbitration provision "shall be interpreted in the broadest way the law will allow," *id.* at 11, and "survive[s] changes in this [Credit Card] Agreement and termination of the Account or the relationship between you and us, including the bankruptcy of any party and any sale of your Account, or amounts owed on your Account, to another person or entity," *id.* at 12.   A separate section of the agreement provides that "[f]ederal law and the law of South Dakota govern the terms and enforcement of this Agreement."  *Id.*

As to the ensuing assignments, defendants have produced (1) a bill of sale and assignment in which Citibank "transfer[s], sell[s], assign[s] . . . and deliver[s] to Buyer," defined as Sherman Originator III LLC, "and to Buyer's successors and assigns, the Accounts" described in an attached spreadsheet, which includes Wexler's account, Dkt. 27-1 at 1; (2) a "transfer and assignment," in which Sherman Originator III LLC "transfers, sells, assigns, . . . and delivers to Sherman Originator LLC all of its right, title and interest in and to the receivables and other assets," including Wexler's account and "electronically stored business records," *id.* at 2, and (3) a transfer and assignment, in which Sherman Originator LLC "transfers, sells, assigns . . . and delivers to LVNV Funding LLC" the same, *id.*; and (4) a power of attorney under which LVNV retains Resurgent to "service, liquidate and manage accounts receivable on [LVNV's] behalf," *id.* at 17–18.

## B.   Procedural History

---

[3] The Court cites to the Bates-stamped page numbers in the credit card agreement.

On February 17, 2022, Wexler filed the Complaint. Dkt. 1. On May 12, 2022, defendants filed motions to compel arbitration and to dismiss. Dkt. 15. In support, defendants submitted a declaration from Patti Sexton, a paralegal employed by Resurgent, attesting to facts indicating, *inter alia*, that LVNV currently owns Wexler's credit card account. Dkt 20-1. The Sexton Declaration referenced agreements that transferred the account from Citibank to Sherman Originator III LLC, from Sherman Originator III LLC to Sherman Originator LLC, and from Sherman Originator LLC to LVNV. *Id.* On July 8, 2022, Wexler filed a motion to compel the production of documents concerning the chain of ownership of the account and to stay defendants' motion to compel arbitration. Dkt. 21. On November 16, 2022, the Court ordered defendants to file, on the docket, the four agreements asserted to establish the chain of ownership and Resurgent's relationship to LVNV on the docket, plus a renewed motion to compel arbitration. Dkt. 26.

On November 23, 2022, defendants filed the bill of sale and assignment, Dkt. 27-1 at 1, the transfer and assignment, *id.* at 2, and the limited power of attorney, *id.* at 17–18. On November 23, 2022, Wexler moved to compel defendants to produce the master purchase and sale agreement ("MPA") referenced in the bill of sale, Dkt. 28, which the Court granted, Dkt. 30, over defendants' opposition, Dkt. 29. On December 22, 2022, defendants submitted the redacted MPA to the Court for *in camera* review. Dkt. 36. The Court deemed defendants' production complete, *id.*, and entered a confidentiality order regarding the MPA, Dkt. 37.

On January 2, 2023, defendants renewed their motion to compel arbitration, Dkt. 38, and filed a memorandum of law, Dkt. 38-1 ("MTC Mem."), and exhibits in support, Dkts. 38-2–5. On January 9, 2023, Wexler opposed the motion to compel. Dkt. 42 ("MTC Opp."). On January 17, 2023, defendants replied. Dkt. 44 ("MTC Reply").

## II.     Applicable Legal Standards

The Federal Arbitration Act ("FAA") provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  The FAA "creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate." *Mitsubishi Motor Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)).  Congress enacted the FAA to reverse "centuries of judicial hostility to arbitration agreements" and "to place arbitration agreements upon the same footing as other contracts." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510–11 (1974) (internal quotation marks and citation omitted).

"The question whether the parties have submitted a particular dispute to arbitration, [that is] the question of arbitrability, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (alteration and internal quotation marks omitted).  There are two questions for courts to consider in ruling on a motion to compel arbitration: (1) whether there is a valid arbitration agreement, and if so, (2) whether the subject of the dispute is within the scope of the arbitration agreement. *Nat'l Union Fire Ins. Co. of Pittsburgh v. Belco Petroleum Corp.*, 88 F.3d 129, 135 (2d Cir. 1996).

In evaluating a motion to compel arbitration, "courts apply a 'standard similar to that applicable for a motion for summary judgment.'" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Bensadoun v. Jobe-Riat*, 316 F.3d 175 (2d Cir. 2003)).  Therefore, courts "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with

6

. . . affidavits," and "draw all reasonable inferences in favor of the non-moving party." *Id.* "[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [the court] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Wachovia Bank, N.A. v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011) (internal quotation marks omitted).

The party moving to compel arbitration "must make a prima facie initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue.'" *Mines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (summary order). The moving party need not "show initially that the agreement would be *enforceable*, merely that one existed." *Id.* (emphasis in original). Thereafter, the party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010) (citing *Green Tree Fin. Corp.–Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000)).

## III.   Discussion

Defendants' motion implicates three issues: First, was there a valid arbitration agreement? Second, may defendants, as non-signatories, invoke that agreement? And finally, if so, are Wexler's claims within the arbitration agreement's scope?

### A.   Was There a Valid Arbitration Agreement?

Although Wexler disputes the admissibility of the credit card agreement, the parties do not dispute its validity. For completeness, the Court briefly addresses why the arbitration agreement here is valid.

The parties agree South Dakota law applies, as it clearly does under the credit card agreement.[4] Under that law, "[t]he use of an accepted credit card . . . creates a binding contract between the card holder and the card issuer[]." S.D. Codified Laws § 54-11-9. And Wexler admits that he accepted and used Citibank's credit card. *See* Compl. ¶¶ 27–29 (alleging that he created a personal credit card account with Citibank).

Courts in this Circuit, applying South Dakota law, have repeatedly recognized the validity of identical Citibank credit card agreements.[5] Such courts have also recognized the validity of similarly worded arbitration agreements within credit card agreements governed by South Dakota law. *See, e.g., Khaliquzzaman v. Equifax Info. Servs. LLC*, No. 17 Civ. 1450 (ENV) (JO), 2018 WL 3825887, at *3 (E.D.N.Y. 2018) (applying S.D. Codified Laws § 54-11-9 to find that plaintiff and defendant "validly entered into [a] credit card agreement that contained

---

[4] *See Nicosia*, 834 F.3d at 231 ("State law principles of contract formation govern the arbitrability question."); *see, e.g., Miley v. Citibank, N.A.*, No. 21 Civ. 7839 (JMF), 2021 WL 5166366, at *1 (S.D.N.Y. Nov. 5, 2021) (holding South Dakota law "applies in this diversity action because the parties' agreement includes a South Dakota choice-of-law clause"); *Shukla v. Viacom Inc.*, No. 18 Civ. 3522 (PAE), 2019 WL 1932568, at *10 (S.D.N.Y. May 1, 2019) (holding New Jersey law governed "inquiry into whether the parties entered in a valid arbitration agreement" where arbitration agreement contained New Jersey choice-of-law provision); *see also Arch Ins. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (where "[t]he parties' briefs assume that [South Dakota] substantive law governs the issues presented, . . . such implied consent is, of course, sufficient to establish the applicable choice of law").

[5] *See, e.g., Miley*, 2021 WL 5166366, at *1 ("[U]nder South Dakota law . . . the agreement is valid[]."); *Haynes v. TransUnion, LLC*, No. 19 Civ. 7157 (JS) (ARL), 2021 WL 7906567, at *7 (E.D.N.Y. Sept. 30, 2021) ("[U]nder South Dakota law, Plaintiff and the Moving Defendants formed a valid agreement to arbitrate claims."), *adhered to on reconsideration*, 2022 WL 1228927 (E.D.N.Y. Apr. 25, 2022); *Madorskaya v. Frontline Asset Strategies, LLC*, No. 19 Civ. 895 (PKC) (RER), 2021 WL 3884177, at *6 (E.D.N.Y. Aug. 31, 2021) (same); *Lebovits v. Cavalry Portfolio Servs., LLC*, No. 20 Civ. 01116 (KMK), 2021 WL 1198967, at *6 (S.D.N.Y. Mar. 29, 2021) (finding, under South Dakota law, that an identical "Card Agreement is a valid contract"); *Ahmed v. Citibank, N.A.*, No. 19 Civ. 4439 (MKB) (SJB), 2020 WL 2988666, at *6 (E.D.N.Y. June 2, 2020) (same, finding the provision "created a binding and valid agreement to arbitrate disputes related to these five accounts"); *McCormick v. Citibank, NA*, No. 15 Civ. 46 (JTC), 2016 WL 107911, at *4 (W.D.N.Y. 2016) (same).

an arbitration term") (collecting cases).  Accordingly, the credit card agreement constitutes a

valid arbitration agreement.

### B.      Can Defendants Invoke the Arbitration Agreement?

The Court next addresses whether defendants, as non-signatories, can invoke the

arbitration provision in the credit card agreement.  Defendants argue that LVNV and Resurgent

may compel arbitration as an assignee of Citibank (LVNV), or under the doctrine of equitable

estoppel or as a third-party beneficiary of the credit card agreement's arbitration provision

(Resurgent).[6]  MTC Mem. at 12–16.  Wexler disputes the admissibility of the credit card and

master purchase agreements, and contests defendants' arguments.  MTC Opp. at 18–30.  The

Court first considers whether the credit card agreement can be considered on this motion,[7] and

then whether each of LVNV and Resurgent can invoke that agreement's arbitration provision.

### 1.      Admissibility

Defendants rely Sexton's declaration to authenticate the credit card agreement.  Dkt. 38-2

("Sexton Decl.") ¶ 1.  Wexler contests the admissibility of the credit card agreement under

Federal Rules of Evidence 803(6) and 901(b)(1).  MTC Opp. at 9–11.  Defendants contend that

the agreement is admissible.  *See, e.g.*, MTC Reply at 1–3.  They are correct.

Wexler argues that the declaration is inadmissible under Rule 803(6) because, although

Sexton "has knowledge of LVNV's business records, [her declaration] does not allege or claim

that she has any firsthand or personal knowledge of Citibank's business records or practices."

---

[6] Defendants also argue LVNV may compel arbitration under equitable estoppel or as a third-party beneficiary.  *See* MTC Mem. at 13–16.  Because it determines LVNV may compel arbitration as Citibank's assignee, however, *see infra* Section III.B.2, the Court does not reach these alternative arguments.

[7] Wexler also contests the admissibility of the MPA, but because that agreement is not necessary to the Court's decision, the Court need not address that challenge.

MTC Opp. at 9.  To satisfy Rule 803(6), Wexler argues, defendants must submit a declaration

from a Citibank employee with personal knowledge of the company's business records practices

and the creation of the credit card agreement.  *Id.* at 9–12.  This objection is easily put aside.

> Rule 803(6) permits "a record of an act, event, condition, opinion, or diagnosis" if:
>
> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> (C) making the record was a regular practice of that activity;
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).  The Second Circuit "has adopted a generous view of the business records

exception, construing it to favor the admission of evidence if it has any probative value at all."

*United States v. Strother*, 49 F.3d 869, 874 (2d Cir. 1995) (internal quotation marks and

alterations omitted).  ·Contrary to Wexler's reading of the Rule, "[e]ven if the document is

originally created by another entity, its creator need not testify when the document has been

incorporated into the business records of the testifying entity."  *United States v. Jakobetz*, 955

F.2d 786, 801 (2d Cir. 1992) (rejecting argument that receipt had to be authenticated by person

with first-hand knowledge of third-party's record system).  Instead, documents are admissible

under the rule "if witnesses testify that the records are integrated into a company's records and

relied upon in its day to day operations."  *Id.* (quoting *In re of Ollag Constr. Equip. Corp.*, 665

F.2d 43, 46 (2d Cir. 1981)).

Consistent with these principles, the Circuit has repeatedly held admissible documents

created by third-party entities where testimony established that those documents had been

incorporated into the defendant's business records, and were relied upon in its day-to-day

operations. *See, e.g.*, *Countrywide Home Loans, Inc. v. Brown*, 223 F. App'x 13, 14 (2d Cir.

2007) (schedule of payments properly admitted where "[u]ncontradicted testimony . . . indicated

that [proponent] conventionally incorporated payment schedules prepared by mortgage servicing

agents into their day-to-day management of mortgage accounts"); *Jakobetz*, 955 F.2d at 800–01

(third-party toll receipt incorporated into a business's records qualified as a business record,

despite the fact that defendant's custodian had not personally participated in receipt's creation to

allow such an inference of authenticity); *In re Ollag Constr. Equip. Corp.*, 665 F.2d at 46

(finding that "business records are admissible if witnesses testify that the records are integrated

into a company's records and relied upon in its day-to-day operations," and noting that relevant

financial statements had been requested by a bank and were regularly used by the bank to make

decisions whether to extend credit).  Courts in this Circuit have applied this precedent to receive

such records.[8]

---

[8] *See, e.g.*, *Berezovskaya v. Deutsche Bank Nat. Tr. Co.*, No. 12 Civ. 6055 (KAM) (CLP), 2014 WL 4471560, at *1 n.13 (E.D.N.Y. Aug. 1, 2014) (rejecting objection due to fact that declarant did not actually witness transfer of loan agreement to trust; sufficient that declarant was "personally familiar" with those documents), *report and recommendation adopted*, 2014 WL 4470786 (E.D.N.Y. Sept. 10, 2014); *JP Morgan Chase Bank, N.A. v. Yuen*, No. 11 Civ. 9192 (NRB), 2013 WL 2473013, at *6 (S.D.N.Y. June 3, 2013) (document "easily admissible" because, "[a]lthough J.P. Morgan created the Spreadsheet, it is undisputed that Chase incorporated the Spreadsheet into its records, and relied upon the document when distributing the Accounts," and, therefore, "it is immaterial that the [document] was not authenticated by someone with personal knowledge of its creation" or custody (internal citations omitted)); *cf. Jenkins v. LVNV Funding, LLC*, No. 14 Civ. 5682 (SJF) (AKT), 2017 WL 1323800, at *5 (E.D.N.Y. Feb. 28, 2017) (records of credit card agreement with third-party bank, submitted by defendants LVNV and Resurgent, admissible under Rule 803(6), where LVNV authorized representative affirmed personal knowledge of its records and that documents were kept in regular course of business); *see also United States v. Wood*, No. 08 Cr. 92A (RJA), 2009 WL 2157128, at *3 (W.D.N.Y. July 15, 2009) (collecting cases) (observing that "courts have also upheld the admission of records under 803(6) where the custodian did not actually create the record but instead took custody of it and incorporated it into its own business records").

Here, as in *Jakobetz*, Sexton's declaration establishes that LVNV has "incorporated [the credit card agreement] into its business records to a sufficient degree to permit an inference as to the receipt's authenticity." *Jakobetz*, 955 F.2d at 801.  Sexton attested that she had "personal knowledge regarding LVNV's creation and maintenance of its normal business records, including computer records of consumer accounts," Sexton Decl. ¶ 1, and that LVNV incorporated the credit card agreement into its records and relied upon it in managing its debt-purchasing and-collecting business, *see id.* ¶¶ 1–4.  She also attested that LVNV's records were "regularly and contemporaneously maintained during the course of [its] business and/or the business of the other entities that previously owned [Wexler's] account." *Id.* ¶ 1.  That showing suffices.  And Wexler has not "show[n] that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(E).  Indeed, although he disputes defendants' ownership of his debt, Wexler himself relied on the credit card agreement in making his one-time payment of that debt. *Compare* Compl. ¶ 42, *with Jakobetz*, 955 F.2d at 801 (plaintiff relied on authenticity of receipt when he submitted it for reimbursement of expenses).

Wexler next argues that Sexton is incompetent to authenticate the document under Rule 901.  That rule requires the proponent of evidence to substantiate "that the item is what the proponent claims it is." Fed. R. Evid. 901(a).  "Rule 901 does not erect a particularly high hurdle" and is "satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *Crawford v. Tribeca Lending Corp.*, 815 F.3d 121, 126 (2d Cir. 2016); *see also United States v. Gagliardi,* 506 F.3d 140, 151 (2d Cir. 2007) (describing the standard for authentication as "minimal").  To clear it, "[t]he proponent need not rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the

evidence is what it purports to be." *Gagliardi*, 506 F.3d at 151 (internal quotation marks omitted).

For certified domestic records of a regularly conducted activity—that is, those records admissible under Rule 803(6)—authentication may be shown by "certification of the custodian or another qualified person." Fed. R. Evid. 902(11). Here, Sexton attested that the copy of the credit card agreement was "a true and accurate copy" of the agreement. Sexton Decl. ¶ 8. She also attested that she had "personal knowledge regarding LVNV's creation and maintenance of its normal business records," that such information was "regularly and contemporaneously maintained during the course of LVNV's business and/or the business of the other entities that previously owned [Wexler's debt]," *see id.* ¶ 1, and that she is "familiar with the recordkeeping practices of LVNV," *id.* ¶ 9. *See also JPMorgan Chase Bank, N.A.*, 2013 WL 2473013, at *8 (where LVNV established proper foundation to admit credit card agreement under Rule 803(6), "no additional foundation is necessary"); Weinstein's Federal Evidence ¶ 900.07(1)(b)(i) (same).

Accordingly, the credit card agreement is properly admissible under Rule 803(6) and considered on this motion.

### 2.    LVNV's Authority to Invoke the Arbitration Agreement

Defendants argue that LVNV may invoke the arbitration agreement because, as Citibank's assignee, it is "connected with" Citibank under the agreement's terms. *See* MTC Mem. at 13 ("All of Citibank's interest in the account have been transferred to LVNV."). Wexler disputes that LVNV is Citibank's assignee, arguing that the scope of rights assigned is ambiguous. MTC Opp. at 14–16.[9]

---

[9] In so arguing, Wexler, while contending that the credit card and master purchase agreements are inadmissible, does not similarly challenge the bill of sale and assignment, the transfer and assignment, or the power of attorney. *See* MTC Opp. at 4–14.

*Lebovits v. Cavalry Portfolio Servs., LLC* is on point and supports defendants. There,

Citibank sold and assigned its rights, title, and interest in the plaintiff's account to Cavalry SPV,

which, in turn, assigned the account to the defendant for collection. 2021 WL 1198967, at *2.

Noting that "[t]he express terms of the Card Agreement provide[d] that Plaintiff's Account was

assignable," the district court, based solely on that agreement and a bill of sale, held that the

defendants could invoke the arbitration agreement. *Id.* at *6 ("Given that the Card Agreement

explicitly states that Citibank may 'assign any or all of [its] rights . . . to a third party' and that

Plaintiff entered into such a contract . . . the Court finds that there was a valid assignment of

rights of Plaintiff from Citibank to Defendants."). It held that, when Citibank assigned its rights

to the defendants, "the assignor's right to performance by the obligor [was] extinguished and the

assignee acquire[d] that right." *Id.* at *5; *see Kroeplin Farms Gen. P'ship v. Heartland Crop.

Ins.*, 430 F.3d 906, 911 (8th Cir. 2005) (alteration and citation omitted) (under South Dakota law,

"the assignee stands in the same shoes as the assignor" (internal alteration omitted)). Thus, upon

the assignment, "[d]efendants [stood] in the shoes of Citibank, and h[e]ld the right to enforce the

Arbitration Clause contained within the Card Agreement under South Dakota law." *Lebovits*,

2021 WL 1198967, at *6; *see id.* ("[C]ourts [in this Circuit] routinely hold that entities that

purchase and take assignment of a consumer account can enforce an arbitration provision

contained within the account agreement." (collecting cases)); *see also Kroeplin Farms*, 430 F.3d

at 911–12 (under South Dakota law, a valid assignment grants the assignee the right to enforce

the original agreement).

As in *Lebovits*, the credit card agreement here provides that "[Citibank] may assign any

or all of our rights and obligations under this Agreement to a third party." *Compare* Credit Card

Agreement at 12, *with Lebovits*, 2021 WL 1198967, at *6. And the assignment to LVNV of

Citibank's arbitration rights is established by identical evidence. In addition to a credit card agreement authorizing assignment, a mirror bill of sale states that Citibank transferred its interests in Wexler's account to Sherman Originator III LLC. *See* Dkt. 27-1 at 1; *see also* Dkt. 38-3 (letter from Citibank informing Wexler of sale of account to Sherman Originator III LLC). Defendants have further documented the transfer of that interest to Sherman Originator LLC, Dkt. 27-1 at 2, and from Sherman Originator LLC to LVNV, *id.*, as well as LVNV's retention of Resurgent, *id.* at 17. These documents, the admissibility of which is not contested, establish that LVNV acquired Citibank's arbitration rights as its assignee. *See Lebovits*, 2021 WL 1198967, at *5–6; *cf., e.g., Biggs v. Midland Credit Mgmt., Inc.*, No. 17 Civ. 340 (JFB) (ARL), 2018 WL 1225539, at *7 (E.D.N.Y. Mar. 9, 2018) (under New York law, compelling arbitration where "the Account Agreement states, in relevant part, that [the credit issuer] 'may sell, assign or transfer any or all of our rights or duties under this Agreement or your account'" and defendants submitted the bill of sale and affidavits); *Marcario v. Midland Credit Mgmt., Inc.*, No. 17 Civ. 414 (ADS) (ARL), 2017 WL 4792238, at *5 (E.D.N.Y. Oct. 23, 2017) (same, where defendants "submitted multiple sworn affidavits with supporting exhibits that include Bills of Sales, Affidavits of Sales, Assignments, and copies of the electronic records of data to establish assignment of the [p]laintiff's account in this case"); *Zambrana v. Pressler & Pressler, LLP*, No. 16 Civ. 2907 (VEC), 2016 WL 7046820, at *5 (S.D.N.Y. Dec. 2, 2016) (credit card agreement, bill of sale, and affidavit sufficient to establish intermediaries and debt collector were bank's assignees).[10]

---

[10] Wexler argues that the scope of Citibank's assignment to LVNV cannot be determined because the definition of "Account" is redacted. *See* MTC Opp. at 14–15. *Lebovits* disposes of that argument, as it compelled arbitration on the basis of an identical bill of sale and assignment only, without relying on the master purchase agreement. *See Lebovits v. Cavalry Portfolio Servs., LLC*, No. 20 Civ. 1116 (KMK), Dkt. 19-2 at 98–99 (bill of sale and assignment).

Accordingly, Citibank assigned LVNV its arbitration rights, and LVNV may compel arbitration under the agreement.

### 3.    Resurgent's Authority to Invoke the Arbitration Agreement

Resurgent was not an assignee of Citibank's rights—a point defendants concede. *See* MTR Reply at 6–7 (describing only LVNV as assignee); *cf.* Compl. ¶ 35 ("Resurgent was never transferred, sold, or assigned any interest or rights with regard to the Debt."); Dkt. 20-1 ¶ 1 (LVNV "outsource[d] the management of its portfolio of accounts to Resurgent"). Unlike LVNV, Resurgent thus cannot invoke the arbitration agreement as an assignee. *See Madorskaya*, 2021 WL 3884177, at *7 ("[T]hough the Agreement allows Citibank to 'assign any or all of [its] rights and obligations under th[e] Agreement to a third party,' Citibank did not expressly assign its right to compel arbitration to Defendant . . . the subsequent creditor and assignee of the rights and obligations under the Agreement is [a third party], not Defendant." (citations omitted)). Resurgent argues that it may compel arbitration on other grounds: (1) under the doctrine of equitable estoppel, (2) under the terms of the Agreement, or (3) as a third-party beneficiary. MTC Mem. at 12–16. Wexler disagrees. MTC Opp. at 18–30. Because Resurgent may compel arbitration under principles of equitable estoppel, the Court declines to resolve defendants' other arguments.[11]

---

[11] There is reason to doubt Resurgent's third-party beneficiary theory. "Under South Dakota law, '[a] contract made expressly for the benefit of a third person may be enforced by [that person] at any time before the parties thereto rescind it.'" *Jennings v. Rapid City Reg'l Hosp., Inc.*, 802 N.W.2d 918, 921 (S.D. 2011) (quoting S.D. Codified Laws § 53-2-6). "This does not, however, entitle every person who received some benefit from the contract to enforce it." *Masad v. Weber*, 772 N.W.2d 144, 153 (S.D. 2009) (quoting *Sisney v. State*, 754 N.W.2d 639, 643 (S.D. 2008)). Rather, "the rule requires that at the time the contract was executed, it was the contracting parties' intent to expressly benefit the third party." *Id.* (quoting *Sisney*, 754 N.W.2d at 643); *accord Jennings*, 802 N.W.2d at 921. Thus, "[t]he terms of the contract must clearly express intent to benefit that party or an identifiable class of which the party is a member."

"The Supreme Court has instructed that state law governs whether a non-signatory may enforce an arbitration clause." *Doe v. Trump Corp.*, 6 F.4th 400, 412 n.8 (2d Cir. 2021) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009)).[12] Under South Dakota law, non-signatory agents may enforce arbitration agreements against signatories where "it would be manifestly unfair to allow plaintiffs to assert claims arising out of agreements against

---

*Jennings*, 802 N.W.2d at 922 (quoting *Sisney v. Reisch*, 754 N.W.2d 813, 818 (S.D. 2008)). A court in this Circuit has held, in evaluating an identical Citibank contract, that the credit card agreement "does not clearly show that at the time it was executed, the contracting parties intended to expressly benefit Defendant—[that is], a debt collector hired by an assignee." *Madorskaya*, 2021 WL 3884177, at *13 (referencing *Jennings*, 802 N.W.2d at 923).

[12] Where, however, "both parties affirmatively rel[y on the Second Circuit's] precedents before the district court," they have "waived any argument regarding the applicability of [state] law" and applied its own. *Doe*, 6 F.4th at 412. Here, on the issue of equitable estoppel, the parties rely on "federal common law in the Second Circuit." MTR Opp. at 26; *see id* at 26–30; MTR Mem. at 15–16. Under that body of case law, the Second Circuit—consistent with the outcome yielded here by South Dakota law—has consistently compelled arbitration in contexts where a non-signatory defendant's corporate relationship with an entity entitled to compel arbitration "justifi[ed] a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitration in a similar dispute." *Doe*, 6 F.4th at 412; *id.* at 413 (citing precedent applying estoppel to corporate "subsidiaries, affiliates, agents, and other related business entities"); *Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) (Circuit "has made clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the ordinary principles of contract and agency" (internal quotation marks omitted)); *Doe v. Trump Corp.*, 453 F. Supp. 3d 634, 641 (S.D.N.Y. 2020) (collecting cases), *aff'd*, 6 F.4th; *cf. Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 127 (2d Cir. 2010) (compelling arbitration under equitable estoppel where, although defendant was a client of plaintiff's employer and not mentioned in the employment agreement, plaintiff understood defendant to be, effectively, her "co-employer"); *Mobile Real Est., LLC v. NewPoint Media Grp., LLC*, 460 F. Supp. 3d 457, 478 (S.D.N.Y. 2020) ("[W]hile the Court need not decide whether [non-signatory defendants] are, in fact, bound by the arbitration agreement signed by [assignee defendants], there is a sufficient relationship between the . . . entities on the current record to delegate this question to the arbitrator."). These precedents support finding estoppel here. *Compare Doe*, 6 F.4th at 413 (looking to whether "an entity . . . was, or would predictably become, with the knowledge and consent of the party opposing arbitration, affiliated or associated with the other . . . in such a manner as to make it unfair to allow the party opposing arbitration to avoid its commitment" (internal alterations and quotation marks omitted)), *with* Credit Card Agreement at 12 (arbitration provision "survive[s] . . . termination of the account or the relationship between you and us, including . . . any sale of your Account, or amounts owed on your Account, to another person or entity").

nonsignatories to those agreements without allowing those defendants also to invoke the arbitration clause contained in the agreements." *Rossi Fine Jewelers, Inc. v. Gunderson*, 648 N.W.2d 812, 815 (S.D. 2002) (internal alterations omitted). These cases reason that plaintiffs should not be able to "avoid the arbitration for which they had contracted simply by adding a nonsignatory defendant, lest the efficacy of contracts and the federal policy favoring arbitration be defeated." *Id.* This rule "applies especially when all the claims against the nonsignatory defendants are based on alleged substantially interdependent and concerted misconduct by both the nonsignatories and one or more of the signatories to the contract." *Id.*; *see also Wright v. GGNSC Holdings LLC*, 808 N.W.2d 114, 119 (S.D. 2011) ("South Dakota has also consistently favored the resolution of disputes by arbitration." (internal quotation marks omitted)).

Here, Wexler's claims "arise out of" the agreement, such that Resurgent can invoke equitable estoppel on "manifest unfairness" grounds. As Citibank's assignee, LVNV "stands in the same shoes as the assignor." *See Kroeplin Farms*, 430 F.3d at 911. And the relationship of LVNV and its agent Resurgent are akin to that of Citibank and its agent in *Clarke v. Alltran Financial, LP*, which held that the agent could compel arbitration of FDCPA claims under the same credit card agreement at issue here. *See* No. 17 Civ 3330 (JFB) (AYS), 2018 WL 1036951, at *7 (E.D.N.Y. Feb. 22, 2018) (collecting cases) (in holding that agent could compel arbitration, stating: "[W]hether [the debt collector's] practices violated the FDCPA arises out of and is related to the credit agreement that created the debt.").

Wexler's claims against non-signatory Resurgent are also "based on alleged substantially interdependent and concerted misconduct by both the nonsignator[y, Resurgent] and one or more of the signatories to the contract, [LVNV]." *Rossi*, 648 N.W.2d at 815. Here, Wexler alleges, Resurgent manages and collects LVNV's debts, Compl. ¶ 25, including Wexler's, *see, e.g., id.*

¶ 43. And Wexler alleges that Resurgent and LVNV engaged together in identical misconduct.

Compl. ¶¶ 73–82. Notwithstanding Resurgent's status as a distinct corporate entity, Wexler's

claims against LVNV and its agent Resurgent are undeniably intertwined. *See Rossi*, 648

N.W.3d at 815 (non-signatory successor bound by arbitration agreement); *see also Doe*, 6 F.4th

at 413 (citing Circuit precedent applying estoppel to corporate "subsidiaries, affiliates, agents,

and other related business entities"); *cf. Padula v. eBay*, No. 21 Civ. 5391 (MKB) (SJB), 2022

WL 18456614, at *7 (E.D.N.Y. Dec. 29, 2022) (non-signatory estopped even where two distinct

and unrelated corporations because "estoppel extends [to situations] where the signatory seeking

to avoid arbitration treated the other signatory and nonsignatory as interchangeable with respect

to its rights and responsibilities under the relevant contract" (citation omitted)), *report and

recommendation adopted*, 2023 WL 375554 (E.D.N.Y. Jan. 24, 2023).

The cases on which Wexler relies are inapposite. MTC Opp. at 26–30. Several involve

Utah law, which is distinct. *Compare, e.g.*, MTC Opp. at 28–29 (citing *Wojcik v. Midland Credit

Mgmt., Inc.*, No. 18 Civ. 3628 (MKB) (RML), 2019 WL 3423567, at *5 (E.D.N.Y. July 30,

2019) (applying Utah law); *Ferro v. Allied Interstate, LLC*, No. 19 Civ. 49 (ARR) (ST), 2019

WL 3021234, at *3 (E.D.N.Y. July 10, 2019) ("Utah law governs the agreement and any dispute

between the parties."); *Untershine v. Advanced Call Ctr. Techs., LLC*, No. 18 Civ. 77 (NJ), 2018

WL 3025074, at *3 (E.D. Wis. June 18, 2018) ("Utah law governs this case."); *Fox v.

Nationwide Credit, Inc.*, No. 09 Civ. 7111 (JWD), 2010 WL 3420172, at *5 (N.D. Ill. Aug. 25,

2010) (applying Utah law)), *with Ellsworth v. Am. Arb. Ass'n*, 148 P.3d 983, 989 (Utah 2006) (to

compel arbitration under principles of equitable estoppel under Utah law, a non-signatory must

sue "on the contract"). And *Madorskaya*, although involving the same Citibank contract, is

materially factually distinct, in that, there, "there [was] no indication that [non-signatory debt

collector] Defendant acted in concert with [the non-party assignee] such that there [was] substantially interdependent and concerted misconduct by both of them." 2021 WL 3884177, at *10 (internal quotation marks omitted); *see id.* at *11 (distinguishing *Clarke* on basis that debt collector was acting on behalf of Citibank, the signatory, and did not have the "additional level of separation between Citibank and the non-signatory defendant seeking to compel arbitration").

Accordingly, because LVNV was an assignee and because Resurgent can invoke equitable estoppel, each may seek to enforce the arbitration agreement.

## C.    Do the FDCPA Claims Fall Within the Scope of the Agreement?

Defendants argue that Wexler's FDCPA claims fall within the scope of the arbitration agreement. MTC Mem. at 10–12. Beyond noting his disagreement, Wexler does not meaningfully contest this point. *See* MTC Opp. at 30.

"[W]hether the parties have submitted a particular dispute to arbitration, [that is,] the question of arbitrability, is an issue for judicial determination *unless* the parties clearly and unmistakably provide otherwise." *Howsam*, 537 U.S. at 83 (alteration, emphasis, and quotation marks omitted); *accord NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1031 (2d Cir. 2014). Accordingly, "in determining whether the arbitrability of a dispute is to be resolved by the court or the arbitrator, the arbitration agreement is determinative." *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 318 (2d Cir. 2021). Where "the arbitration agreement is broad and expresses the intent to arbitrate all aspects of all disputes, this—coupled with incorporation of rules that expressly empower an arbitrator to decide issues of arbitrability—constitutes clear and unmistakable evidence of the parties' intent to delegate the question of arbitrability to the arbitrator." *Id.* at 318–19; *see also Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 208 (2d Cir. 2005) ("We have held that when, as here, parties explicitly incorporate

rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."). This principle "flow[s] inexorably from the fact that arbitration is simply a matter of contract between the parties." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995).

Here, the arbitration provision incorporates the American Arbitration Association's rules repeatedly and explicitly, *see, e.g.*, Credit Card Agreement at 13, and provides for arbitration of "all Claims," including "any claim, dispute or controversy between you and us arising out of or related to your Account . . . or our relationship," "no matter what legal theory they're based on or what remedy . . . they seek," *id.* at 11. This is the kind of "broad" agreement that "expresses the intent to arbitrate all aspects of all disputes," and "expressly empower[s] an arbitrator to decide issues of arbitrability." *DDK Hotels, LLC.*, 6 F.4th at 318–19; *see Lebovits*, 2021 WL 1198967, at *7 (same, collecting cases).[13] Its language "evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to [the Card Agreement]." *Lebovits*, 2021 WL 1198967, at *7; *see also Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir.

---

[13] The Second Circuit and courts within it have consistently found agreements containing similar language to be broad. *See, e.g.*, *ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins.*, 307 F.3d 24, 26, 31 (2d Cir. 2002) ("[A]ny dispute [that] shall arise between the parties . . . with reference to the interpretation of this Agreement or their rights with respect to any transaction involved" was a broad arbitration clause); *Marcus v. Frome*, 275 F. Supp. 2d 496, 504 (S.D.N.Y. 2003) (same, as to "any dispute, controversy or claim arising out of or relating to this Agreement"); *Vera v. Saks & Co.*, 218 F. Supp. 2d 490, 494 (S.D.N.Y. 2002) (same, as to "[a]ny dispute . . . arising out of or relating to this Agreement"), *aff'd*, 335 F.3d 109 (2d Cir. 2003); *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*, 182 F.R.D. 97, 101–02 (S.D.N.Y. 1998) (same, as to "any dispute arising under this charter"), *aff'd*, 241 F.3d 135 (2d Cir. 2001); *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995) (same, as to "[a]ny claim or controversy arising out of or relating to th[e] agreement"); *see generally Loc. Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*, 67 F.4th 107, 113 (2d Cir. 2023) ("A broad clause is one that purports to refer to arbitration all disputes arising out of a contract, whereas a narrow clause limits arbitration to specific types of disputes." (internal quotation marks and alterations omitted)).

2003) (arbitration agreement demonstrates a "clear and unmistakable intent to submit questions

of arbitrability to arbitration" where "the agreement plainly states the parties' intent to submit

[a]ll disputes . . . concerning or arising out of the [contract] to arbitration" (internal quotation

marks omitted)); *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) ("The words

'any and all' are elastic enough to encompass disputes over whether a claim is . . . within the

scope of arbitration.").

In any event, even if the question of arbitrability were for the Court to decide, courts in

this District have repeatedly found FDCPA claims to be within the scope of identical Citibank

arbitration clauses under South Dakota law. *See, e.g.*, *Lebovits*, 2021 WL 1198967, at *7 ("[I]t is

well-settled that statutory claims, like those under the FDCPA, are subject to arbitration under

the FAA."); *Shetiwy v. Midland Credit Mgmt.*, 959 F. Supp. 2d 469, 475 (S.D.N.Y. 2013)

(same).

Accordingly, the Court grants the motion to compel arbitration.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to compel arbitration.

Accordingly, the Court stays this action in its entirety. *Katz v. Cellco P'ship*, 794 F.3d 341, 347

(2d Cir. 2015). The Court respectfully directs the Clerk of the Court to terminate the motion

pending at docket 38 and to stay this case. The parties are directed to file a joint status update

every 60 days as to the status of the arbitration proceeding.

SO ORDERED.

*Paul A. Engelmayer*

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: June 30, 2023
       New York, New York